**FILED**
**CLERK**

4:46 pm, Jul 31, 2025

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
ROBERT JUDE PERSAD,

               Plaintiff,

   -against-

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
--------------------------------X

                            <u>MEMORANDUM & ORDER</u>
                            20-CV-5462 (JS)

APPEARANCES
For Plaintiff:         Charles E. Binder, Esq.
                   Law Office of Charles E. Binder and
                     Harry J Binder, LLP
                   485 Madison Avenue, Suite 501
                   New York, New York  10022

For Defendant:        Sophie Doroba, Esq., and
                   Daniella M. Calenzo, Esq.
                   Special Assistant U.S. Attorneys
                   United States Attorney's Office
                   Eastern District of New York
                   c/o Office of General Counsel SSA
                   Office of Program Litigation
                   6401 Security Boulevard
                   Baltimore, Maryland  21235

SEYBERT, District Judge:

       Plaintiff Robert Jude Persad ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of his application for Supplemental Social Income ("SSI") payments by the

Commissioner of Social Security (the "Commissioner"[1]).    (See Compl., ECF No. 1, ¶¶1-11.)    Pending before the Court are Plaintiff's Motion for Judgment on the Pleadings (the "Motion"), and the Commissioner's Cross-Motion for Judgment on the Pleadings (the "Cross-Motion"). (See Motion, ECF No. 15; see also Support Memo, ECF No. 16; Cross-Motion, ECF No. 20; Cross-Support Memo, ECF No. 20-1; Reply, ECF No. 21.)    For the following reasons, Plaintiff's Motion is GRANTED, and the Commissioner's Cross-Motion is DENIED.

BACKGROUND[2]

I.    Agency Procedural History

On November 10, 2016, Plaintiff filed for SSI benefits (hereafter, the "Onset Date").    (R. 280-285; see also R. 10.) After Plaintiff's claim was initially denied on April 14, 2017 (R. 10), he requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted on August 7, 2019 (hereafter, the "Disability Hearing").    (R. 10.)    Plaintiff was accompanied by an attorney representative (R. 9, 70.), and vocational expert ("VE") Dian Haller testified at the Disability Hearing (R. 70, 99-105).

---

[1]  Herein, the Court may refer to the Social Security Administration as the "Agency".

[2]  The background is derived from the Administrative Transcript filed by the Commissioner on July 30, 2021.    (See ECF No. 11.) For purposes of this Memorandum & Order, familiarity with the administrative record is presumed.  Hereafter, the Administrative Transcript will be denoted by the Court as "R".

2

II.   <u>Evidence Presented to the ALJ</u>

    A.   <u>Overview and General Information</u>

The Court first summarizes Plaintiff's employment history, relevant medical history, and his testimonial evidence at his disability hearing before the ALJ.  It then turns to the testimony provided by the vocational expert ("VE") at the disability hearing.

Born in 1976, Plaintiff was educated through the Tenth Grade of high school.  He has no past relevant work history.  When he sought SSI benefits, Plaintiff "alleg[ed] disability due to a learning disability, agoraphobia, bipolar disorder, and back pain." (Cross-Support Memo at 1 (citing R. 275, 280, 298).)  The ALJ found Plaintiff has the following severe impairments: lumbar degenerative disc disease with spondylosis and compression status post laminectomy; thoracic degenerative disc disease; right carpal tunnel syndrome; trigger finger right thumb; left hip degenerative joint disease; asthma/chronic obstructive pulmonary disease ("COPD"); obstructive sleep apnea; morbid obesity; bipolar disorder; post-traumatic stress disorder; and anxiety disorder. (<u>See</u> R. 12.)  Before this Court, Plaintiff focuses upon the assessments of his chronic lower back pain and his mental impairments. (<u>See</u> Support Motion at 16-27; <u>see also, e.g.,</u> Reply at 1-5; Cross-Support Memo at 18 (asserting Plaintiff's argument, that ALJ failed to properly determine Plaintiff's RFC, is premised

primarily upon Plaintiff's "back and mental impairments").)
Because of that, the Court does likewise and does not discuss
evidence or arguments regarding Plaintiff's other impairments.

   B.   Relevant Medical History

        1.   Plaintiff's Lower Back

        On November 30, 2016, Plaintiff was seen in the Good
Samaritan hospital Emergency Room by Carlos Rios, P.A. ("PA Rios"),
complaining of lower back pain radiating to his left buttock and
thigh.  (R 610.)  Plaintiff reported his pain was constant and
worsened with movement. (Id.)  Upon exam, PA Rios found Plaintiff
had pain with palpation of the left lumbosacral spine, left
buttock, and left thigh; he diagnosed Plaintiff with back pain.
(R. 611.)  A muscle relaxant was prescribed.  (R. 612-613.)

        On December 1, 2016, Plaintiff saw pain medicine
specialist Daniel Kohane, M.D. ("Dr. Kohane"), who evaluated
Plaintiff's complaints of lower back and left leg pain.  (R. 364.)
Plaintiff reported his pain was constant and severe, rating it
10-out-of-10, and was only minimally relieved with medication.
(R. 364-365.)  Plaintiff also told the Doctor his lower back pain
radiated to the left leg with associated numbness and tingling.
(R. 364.)  On examination, Dr. Kohane found: an antalgic gait;
limited spinal flexion and extension with pain; diffuse pain with
palpation; multiple trigger points; muscle tenderness; painful
facet joints and sacroiliac joints with palpation; positive

4

Gaenslen's test; positive Sacroiliac Distraction test; positive thigh thrust; positive Kemp's maneuver; and, pain with straight leg raising test. (R. 365.) As a result, Dr. Kohane diagnosed Plaintiff with: lumbar radiculitis; lumbago of the lumbosacral region with sciatica; and myalgia. (R. 364.) Also on December 1, 2016, Plaintiff had an MRI of the lumbar spine; it showed multiple herniations and spinal stenosis.[3] (R. 373-74.)

On December 3, 2016, Plaintiff had a follow-up visit with Dr. Kohane to discuss the MRI results. (R. 1514.) At that time, Plaintiff reported continued back and leg pain, which pain he rated at an 8-out-of-10 level and which worsened with prolonged sitting and standing. (R. 1515.) No changes were noted on examination. (Id.) Dr. Kohane recommended a lumbar epidural steroid injection and prescribed pain medications. (R. 1514.)

On December 17, 2016, Plaintiff saw Neurologist Hugh Xian, M.D. ("Dr. Xian"), of South Shore Neurologic Associates,

---

[3] In technical language, the radiologist found: straightening of the normal lumbar lordosis (curve) with mild convexity to the left; diffuse disc dehydration and narrowing with endplate changes; a narrow central canal; an L1-2 broad-based disc herniation with slight inferior migration causing moderate-to-marked central stenosis and foraminal compromise; an L2-3 bulging disc with right-sided herniation causing marked central and foraminal stenosis; L3-4 bulging and broad-based herniation resulting in marked central and foraminal stenosis; L4-5 facet hypertrophy and bulging broad-based herniation eccentric towards the left with marked central and foraminal compromise; and an L5-S1 bulging and broad-based herniation with moderate-to-marked central stenosis and marked bilateral foraminal compromise. (R. 373-374.)

P.C. (hereafter, "South Shore Neurologic"). (R. 463.) Once more, Plaintiff described suffering with constant low back pain, which had worsened and which radiated to his left lower extremity. (Id.) He had not improved with medication or physical therapy and developed new thoracic spine pain. (Id.) Dr. Xian also reported: "The patient has used a cane for walking." (R. 463.) On exam, Dr. Xian found Plaintiff had: tenderness of the thoracic and lumbar spine; decreased pinprick sensation in the lower extremities; and a slow gait. (R. 466.) The Doctor diagnosed Plaintiff with: low back pain; spinal stenosis; radiculopathy; and, thoracic spine pain. (R. 466.) He recommended Plaintiff engage in pain management before considering invasive measures, i.e., surgery, and increased Plaintiff's the dosage of pain medication, as well as prescribed additional medications for Plaintiff. (R. 466-67.)

A December 19, 2016 electromyography ("EMG") performed on Plaintiff showed evidence of chronic, multilevel, bilateral lumbosacral radiculopathy from L3 through S1. (R. 513-14.) In conjunction with the EMG, on December 21, 2016, Plaintiff had a follow-up appointment with a certified adult nurse practitioner ("ANP-C") at South Shore Neurologic. (R. 468, 471.) At that time, Plaintiff's symptoms were unchanged, with his lumbar spine pain described as 7-out-of-10 and his radiating leg pain described as 9-out-of-10. (Id.) Additionally, the ANP-C recorded Plaintiff "bought a cane in a thrift shop as he had fallen a few times due

to his left leg and knee 'giving out'. He use[s] the cane now to assist his ambulation." (R. 468.) The ANP-C's physical exam of Plaintiff revealed: tenderness of the paraspinal muscles; pain in both buttocks; painful greater trochanters; painful sacroiliac joints; a positive Patrick's test bilaterally; and, pain with straight leg raising bilaterally. (R. 470.) Among other components, part of Plaintiff's recommended plan of treatment was to: have a lumbar steroid epidural injection; continue using a cane to ambulate; and, to be prescribed new medications. (R. 471 (emphasis added).)

A December 31, 2016 MRI of Plaintiff's thoracic spine showed degenerative changes throughout the thoracic spine, including extensive disc herniations, various bulging discs, and related deformities. (See, e.g., R. 407-08.) Thereafter, on January 19, 2017, Plaintiff was evaluated by pain medicine specialist Khondeker Rahman, M.D., of South Shore Neurologic. (R. 472.) The Doctor administered a lumbar epidural injection in Plaintiff's lower back, at L1-2 and L2-3, which was a "very difficult . . . needle insertion" due to narrowed disc space and possible calcification. (Id.)

On January 20, 2017, Plaintiff was seen by orthopedic surgeon Daniel Brandenstein, D.O. ("Dr. Brandenstein"). (R. 401.) Plaintiff reported symptoms of low back pain in the lumbar region, which pain he rated at an 8-out-of-10 level (id.); his pain

radiated to both of his lower extremities, with the pain being
greater on Plaintiff's left side and with Plaintiff suffering
associated numbness and tingling. (Id.) Plaintiff informed Dr.
Brandenstein that his pain worsened with sitting, standing, and
walking. (Id.) Dr. Brandenstein's exam found Plaintiff displayed:
apprehensive motor strength of the bilateral lower extremities;
pain to palpation of the lumbar spine: and, apprehensive
dorsiflexion secondary to pain (R. 402.) Dr. Brandenstein
diagnosed: lumbar spondylosis; lumbar stenosis with neurogenic
claudication; and, morbid obesity. (Id.) In a subsequent January
24, 2017 "To Whom It May Concern" form, Dr. Brandenstein indicated
Plaintiff: had been seen on January 20, 2017; was diagnosed with
"Lumbar stenosis w/neurogenic claudication"; and, "cannot sit or
stand for prolonged periods of time". (R. 393.)

On February 3, 2017, Plaintiff had a follow-up visit at
South Shore Neurologic with the ANP-C. (R. 478, 481.) Plaintiff
reported no relief from his epidural steroid injection and that
his medication was minimally effective. (R. 478.) A physical
exam revealed, inter alia: paraspinous tenderness; bilateral
buttock pain; increased pain with lumbar extension; limited lumbar
flexion; bilateral sacroiliac joint pain; and, an antalgic gait.
(R. 480.) The ANP-C further observed Plaintiff: "walks with a
cane"; reported no relief from his January 2017 steroid epidural
injection; and, was provided "with a small supply of narcotic

8

medication" and other medication for temporary pain control.  (R. 480-81.)

On February 10, 2017, Plaintiff had a follow-up visit with Dr. Brandenstein, during which visit Plaintiff rated his lower back pain as a 9-out-of-10 and described it as radiating bilaterally to his buttocks and legs; he also complained of associated numbness and tingling in his left foot and stated the left side of his lower extremities experienced the greater pain. (R. 399.)  Plaintiff also reported he was able to ambulate for only "50-100 feet before the onset of burning pain in his legs." (Id.)  An exam of Plaintiff showed evidence of: left sciatica and neurogenic claudication, which was worse on Plaintiff's left side; apprehensive motor testing; pain with palpation of the lumbar spine; and apprehensive dorsiflexion due to pain.  (R. 400.)  Dr. Brandenstein discussed surgery as an option, which the Doctor believed could help alleviate some of Plaintiff's radiating pain, but was unlikely to address his back pain.  (Id. (emphasis added).)

On February 24, 2017, Plaintiff returned to South Shore Neurologic and was seen by the ANP-C who, upon examination of Plaintiff, found he displayed tenderness and pain in the lumbar region.  (R. 482, 484, 485.)  In her comments, the ANP-C recorded Plaintiff had an antalgic gait and ambulated with a cane.  (R. 484.)  The ANP-C prescribed Plaintiff Nucynta, an opioid pain

medication, which was added to Plaintiff's medication regimen. (R. 484-85.)

On March 13, 2017, Dr. Brandenstein performed the following procedures on Plaintiff: a lumbar laminectomy at L2, L3, and L4; a partial laminectomy at L1 and L5; and, a repair of durotomy at L4. (R. 382-384.) In a March 17, 2017 "To Whom It May Concern" form, the Doctor indicated Plaintiff "may not work at this time" and further stated Plaintiff would be unable to work for the next four months, at the end of which time, he would be reevaluated. (R. 392.)

At his March 24, 2017 post-surgical follow-up with Dr. Brandenstein, Plaintiff reported his pain had decreased to a 2-out-of-10 level. (R. 394.) The Doctor stated that, at Plaintiff's next clinical assessment, he would consider whether to have Plaintiff engage in physical therapy. (Id.)

At an April 5, 2017 office visit with Dr. Xian and consistent with Dr. Brandenstein's expectations, Plaintiff "reported no improvement of his low back pain, but less pain in his legs." (R. 490.) Plaintiff was using a cane to ambulate and was continuing to use pain medications. (Id.) A physical exam found neurologic damages, e.g.: decreased pinprick sensation of the left lower leg; limited motor strength in the same leg due to pain; a slow gait; and, decreased reflexes of the upper extremities. (R. 492.)

10

At an April 18, 2017 five-week-post-operative visit with Dr. Brandenstein, Plaintiff reported mechanical back pain, which the Doctor stated was "expected after multilevel lumbar laminectomy". (R. 528.) While he noted Plaintiff was doing well postoperatively, Dr. Brandenstein also noted Plaintiff had "fair pain control." (Id.) On April 21, 2017, three days later, no significant changes were noted, although Dr. Brandenstein recorded Plaintiff had "adequate pain control" at that time. (R. 530.)

Further, on April 21, 2017, Dr. Brandenstein completed a six-page "Spinal Impairment Questionnaire" regarding Plaintiff. (See R. 419-24.) In said Questionnaire, the Doctor reported that, beginning in January 2017, he treated Plaintiff on a monthly basis for: status-post lumbar laminectomy at L1 through L5; morbid obesity; lumbar spondylosis; lumbar stenosis; neurogenic claudication; thoracic disc herniation; and peripheral neuropathy. (R. 419.) The Doctor cited to MRIs of the lumbar and thoracic spine supporting his diagnoses (id.); he also identified clinical findings that supported his diagnoses, e.g.: limited motion in the lumbar spine and lower extremity; thoracic and lumbar tenderness; muscle spasms in the thoracic and lumbar spine; sensory loss in the lower extremity; reflex changes bilaterally in the S1/Achilles; muscle weakness/motor loss secondary to apprehension/pain; trigger points; swelling; positive straight leg raising bilaterally; and, an antalgic gait. (R. 420.) Based upon

11

these diagnoses, Dr. Brandenstein opined, in an eight-hour workday, Plaintiff was able: to sit one hour, and when sitting, needed to elevate his legs; and to stand and walk less than one hour. (R. 421-22.)  Further, Plaintiff could occasionally lift or carry up to 20 pounds. (Id.)  The Doctor reported Plaintiff could not: "ambulate effectively" given he was unable to walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; carry out routine ambulatory activities; or climb a flight of stairs at a reasonable pace with use of a single-hand rail. (Id.)  At that time, Dr. Brandenstein also recorded Plaintiff was using a walker to assist with ambulation. (Id.) The Doctor opined Plaintiff's pain, fatigue, and other symptoms would frequently interfere with his attention and concentration, i.e., from 1/3 to 2/3 of an eight-hour workday, as well as require Plaintiff to take unscheduled breaks "very often/possibly every hour" during such a workday. (R. 423 (further indicating Plaintiff's symptoms would likely increase if he were placed in a competitive work environment, since he would suffer more pain in his back and legs).)  Dr. Brandenstein estimated, on average, Plaintiff would miss work more than three times a month due to his impairments. (R. 424.)  Further, the Doctor opined Plaintiff was not a malingerer. (R. 423.)

On April 21, 2017, Plaintiff had a follow-up visit at South Shore Neurologic. (R. 495.)  Despite diminished leg pain,

12

Plaintiff's back pain remained at a daily 7-out-of-10 level; yet, during the visit, Plaintiff reported his pain level at a 9-out-of-ten. (R. 495, 497.) The ANP-C reported Plaintiff was "very distressed with his current painful condition." (R. 495.) Moreover, Plaintiff reported his pain was worse with "all types of movement" and he was still experiencing numbness in his left foot. (Id.) Plaintiff felt his Oxycodone prescription was "'barely' effective"; as a result, his pain medications were increased. (R. 495, 498.) The ANP-C also recorded Plaintiff ambulated with a cane and commented that he displayed an unsteady gait. (R. 495, 497.) A physical examination of Plaintiff revealed, inter alia, tenderness of the spine, and bilateral pain in his buttocks, greater trochanters, and sacroiliac joints. (R. 497.)

At his May 26, 2017 visit with the South Shore Neurologic ANP-C, Plaintiff reported a recent fall at home after his right leg "gave out" but otherwise no significant changes in symptoms. (R. 499.) Plaintiff reported he had intense pain near the lumbar spine and he was "very distressed with his chronic pain." (Id.; see also id. at 502 (noting Plaintiff's "pain [wa]s still very high").) The ANP-C observed Plaintiff was using a cane to ambulate and had difficultly walking on his heels and toes. (R 499, 501.) She also noted Plaintiff was considering spinal cord stimulation. (R. 502.)

13

On July 25, 2017, Plaintiff had an MRI of the lumbar spine; in general terms, it showed: some forward vertebra slippage; evidence of prior surgery; levels of degenerative disc disease; loss of disc height at all levels; atrophy of the posterior paraspinal muscles; and, various disc bulges, stenoses, and neural foraminal narrowings.[4] (R. 452-453.)

On August 2, 2017, Plaintiff returned to South Shore Neurologic, reporting daily severe low back pain. (R. 503.) The ANP-C reported Plaintiff had been unable to obtain significant relief with medication or physical therapy and that he appeared to be in distress. (R. 503, 505.) A physical exam of Plaintiff showed: he had a severely reduced range of motion in his lumbar spine; Plaintiff displayed an antalgic gait and was using a cane; he had difficulty with heel and toe walking; his deep tendon reflexes were symmetrically decreased; he was afflicted with bilaterally painful buttocks and greater trochanters; and, he had

---

[4] In more technical terms, the MRI showed: minimal anterolisthesis of L4 on L5 and minimal retrolisthesis of L5 on S1; evidence of prior surgery; degenerative endplate changes at L1-2 and L5-S1; loss of disc height at all levels; atrophy of the posterior paraspinal muscles; a broad-based disc bulge at L1-2 with facet hypertrophy and moderate central stenosis with mild bilateral neural foraminal narrowing; a small disc bulge at L2-3 with moderate right and mild left neural foraminal narrowing; a small disc bulge at L3-4 with mild bilateral neural foraminal narrowing; a disc bulge at L4-5 with facet hypertrophy causing mild central canal stenosis with severe bilateral neural foraminal narrowing; and an L5-S1 disc bulge and facet hypertrophy causing severe bilateral neural foraminal narrowing.

tenderness in his spinous and paraspinous muscles. (R. 505) Plaintiff's pain medication dosages were increased, and he was prescribed additional pain medications. (R. 506 (showing Plaintiff was prescribed Oxycodone, Gabapentin, and Chlorzoxazone).) The ANP-C also made a psychiatry referral for Plaintiff "for cognitive behavior therapy for chronic pain". (Id.; see also R. 504 (reporting Plaintiff showed symptoms of anxiety).)

Also on August 2, 2017, Plaintiff had a follow-up visit with Dr. Brandenstein, during which visit Plaintiff complained of worsening stiffness and spasms in his low back, which spasms cause his back to "lock up". (R. 535.) The Doctor reviewed Plaintiff's July 25 MRI findings and ordered physical therapy to "help treat low back pain issues/myositis issues". (R. 537, 538.) Given the combination of Plaintiff's back pain complaints and his past medical history, Dr. Brandenstein opined Plaintiff may be permanently disabled. (R. 538.)

At a September 5, 2017 follow-up visit with Dr. Brandenstein, the Doctor noted Plaintiff continued to complain of worsening stiffness and spasms in his lumbar spine. (R. 1384.) Plaintiff further complained of "right leg discomfort and needing to drag the leg often particularly when walking up and down the stairs." (Id.; see also R. 1386.) In conjunction therewith, the Doctor observed Plaintiff ambulated "in a non-myelopathic manner"

and with a cane. (R. 1386.) Dr. Brandenstein recommended pain management with a spinal cord stimulator (Id.)

      Thereafter, on October 11, 2017 and to address his chronic low back pain, Plaintiff was seen by pain medicine specialist Phillipe Vaillancourt, M.D. ("Dr. Vaillancourt"), of South Shore Neurologic. (R. 509.) Plaintiff described back pain that extended down the posterior/lateral right thigh to the knee with tingling in all the toes on the right; he stated his pain increased with sitting or standing for long periods. (Id.) Plaintiff appeared uncomfortable (R. 511.) Upon exam, Dr. Vaillancourt found Plaintiff had: tenderness in the spinous, paraspinous, gluteus, and sacroiliac joints; lumbar segmental restriction; limited flexion and extension of the lumbar spine; hypesthesia of the right foot; weakness in both lower extremities; an antalgic gait; and decreased deep tendon reflexes. (Id.) The Doctor: diagnosed Plaintiff with chronic low back pain; continued Plaintiff on Oxycodone and Gabapentin; and, referred Plaintiff for aqua-physical therapy. (Id.)

      On October 16, 2017, Plaintiff returned to his prior treating pain medicine specialist, Dr. Kohane. (R. 1462.) He described constant low back pain radiating to the right lower extremity with numbness and tingling. (Id.) Plaintiff reported his lumbar spine pain level ranged from 7-out-of-10, such as on October 16, to 10-out-of-10 on "bad" days. (Id.) The Doctor noted

16

Plaintiff ambulated with an antalgic gait and used a cane. (Id.) Dr. Kohane's exam of Plaintiff revealed: painful and limited flexion and extension of the spine; lumbar paraspinal tenderness with multiple trigger points; a positive Kemp's test; painful palpation of the facet joints; and, grossly limited range of motion in both knees, as well as tenderness in both knees. (R. 1463.) The Doctor diagnosed Plaintiff with: lumbar radiculitis; post-laminectomy syndrome; sacroiliitis; and, knee pain.[5] (R. 1463, 1465.)

On November 15, 2017, Plaintiff saw Dr. Kohane to review the results of an October 27, 2017 MRI. (R. 1467-68.) At that time, Plaintiff reported a pain level of 8-out-of-10. (R. 1467.) Upon exam, the Doctor found, inter alia: Plaintiff had an antalgic gait and used a cane; Plaintiff's lumbar spine range of motion had a forward flexion limited to 20 degrees and was painful and had limited extension that was painful at zero degrees; a bilateral positive Kemp's test, but a negative straight leg raise test; and, bilateral facet joints painful with palpation. (R. 1467.) Dr.

---

[5] Plaintiff had an October 19, 2017, evaluation by Orthopedist Keith Reinhardt, M.D. ("Dr. Reinhart"), for his knee pain. (R. 555.) Plaintiff reported a four-to-five-year history of knee pain, which he rated at a constant 8-out-of-10 pain level. (Id.) Further, Dr. Reinhart noted Plaintiff was "transferring and ambulating with a cane." (Id.) Due to Plaintiff's obesity, the Doctor's physical exam was limited; however, he found Plaintiff exhibited fluctuance over the prepatellar bursa bilaterally. (R. 557.) Dr. Reinhardt diagnosed knee pain and prescribed a prescription nonsteroidal anti-inflammatory drug. (Id.)

Kohane also found Plaintiff's knees' ranges of motion to be grossly limited and with pain.  (R. 1468.)  Specifically as to Plaintiff's lumbar radiculitis, the Doctor reported:

> Low back pain remains constant[,] severe[,] and radicular.  Pain is affecting [Plaintiff's] daily life.  Despite having spine surgery[,] he continues to have pain. Does not want to have further surgery nor believes it will be beneficial. . . . Minimal relief with conservative management.

(R. 1468.)  Ultimately, Dr. Kohane reported Plaintiff's lumbar radiculitis was "[w]orsening".  (Id.)  Thus, the Doctor administered a lumbar epidural steroid injection.  (R. 1469.)

On January 9, 2018, Plaintiff had a visit with Dr. Brandenstein, at which time he described persistent low back pain that radiated down his right leg with increased pain after physical activity.  (R. 1381.)  The Doctor's examination of Plaintiff revealed findings of right greater trochanteric bursitis and tendinopathy.  (R. 1383.)  And, X-rays taken in the office showed lumbar spondylosis.  (Id.)  The Doctor recommended trigger point injections for pain relief. (Id.)

On February 28, 2018, Plaintiff returned to Dr. Vaillancourt, reporting chronic low back pain.  (R. 878, 879.) The Doctor noted Plaintiff: did not have any significant improvement after his surgery; was on escalating doses of opioids for pain management; and since mid-October 2017, had attended at least seven sessions of aqua-physical therapy with uncertain

effects.   (R. 878.)   During the February 28 visit, Plaintiff reported his pain was "worse with sitting or standing too long or walking more than [a] short distance." (Id.)  Plaintiff rated his pain that day at a 6-out-of-10 level and appeared to be in discomfort.   (R. 880.)   On exam, Dr. Vaillancourt found, <u>inter alia</u>: tenderness of the spinous process; lumbar segmental restriction; limited flexion and extension; hypesthesia of the right foot; generalized weakness; an antalgic gait and balance; and, decreased reflexes.  (Id.)  The Doctor recommended a medial branch block.   (Id.)   Plaintiff's medications included Fentanyl patches, Oxycodone, and other pain medications.  (R. 881.)

2.    <u>Plaintiff's Mental Impairments</u>

Record evidence indicates Plaintiff engaged in come mental health treatment between 2002 and 2003 with provider Catholic Charities.  (See R. 426-27.)  During his incarceration, from sometime in 2013 until November 9, 2016, Plaintiff was treated in prison for his mental illness.   (See, e.g., R. 427 (noting Plaintiff "[h]as had past 3 year [history] of Mental Illness and <u>treated in prison</u>" (emphasis added)).)  There are no records for either of these time periods detailing Plaintiff's mental health treatment.   However, from the subsequent intake notes from Parientes of Suffolk (hereafter, "Parientes"), at a minimum, it can be surmised Plaintiff was being prescribed medications for mental health issues, which medication ran out, presumably

19

prompting his visit to Parientes.  (See R. 426; see also id. at R. 427 (stating Plaintiff's last prescription was from November 2, 2016, but he had run out of medication).)

On December 10, 2016, Plaintiff began post-incarceration mental health treatment at Parientes.  (R. 426-27.)  On that date, he participated in an intake evaluation at Parientes during which visit he described experiencing depression and anxiety intermingled with "bursts of energy".  (R. 426.)  Plaintiff also reported being unable to finish tasks he began and avoiding crowds. (Id.)  He was diagnosed with unspecified bipolar and related disorder and agoraphobia.  (R. 427.)  At his appointment the next week, on December 17, 2016, Plaintiff was advised to begin weekly therapy for his conditions.  (R. 428.)  Thereafter, Plaintiff met with Nurse Practitioner Eva MacDowall ("NP MacDowall") several times.

On December 22, 2016, during NP MacDowall's psychiatric evaluation of Plaintiff, Plaintiff informed the NP he: was anxious; had low energy; suffered nights sweats, which caused him to wake up multiple times per night; was paranoid others could read his thoughts; and, was hypervigilant.  (R. 430.)  NP MacDowall found Plaintiff: had fair insight and judgment; had a constricted affect; and, was highly anxious, with an irritable mood.  (R. 429.)  The NP diagnosed Plaintiff with generalized anxiety disorder and

chronic PTSD; she prescribed both anti-depressant and anti-anxiety medications for Plaintiff. (R. 431.)

On January 5, 2017, Plaintiff had a follow-up visit with NP MacDowall. (R. 437-38.) He reported his depression was improved, rating it at a 5-out-of-10 level, and his sleep was normal. (R. 437.) NR MacDowall continued Plaintiff's medications at their then-current doses. (R. 438.) She assessed Plaintiff as much improved from his previous visit. (Id.)

On February 2, 2017, Plaintiff reported: being anxious, rating it at a "7/10" level; having sleeping difficulties; and, increased depression, rating it at a "6/10" level, which Plaintiff attributed to his back problems. (R. 439.) While her mental assessment of Plaintiff showed predominately "appropriate", "good", and "normal" results, NP MacDowall noted Plaintiff's mood was anxious; overall, she recorded Plaintiff's assessment as "[m]ildly improved from previous visit". (R. 439-40.) (Id.) NP MacDowal maintained Plaintiff's medications but increased his dosage of Klonopin "due to anxiety and insomnia". (R. 440.)

On March 3, 2017, Dr. Sal Sarmiento,[6] a psychiatrist with Parientes, met with Plaintiff. (R. 441.) Among other things, he recorded Plaintiff's mood to be "euthymic" or stable, and Plaintiff reported to be "feeling a lot better with his medications." (Id.

---

[6] The ALJ misidentified the Doctor as "Dr. Sal Saviento". (See ALJ Decision, R. 22.)

(emphasis added).)    The Doctor's notes indicate he changed Plaintiff's dosages of Venlafaxine and Buspar, and discussed those dosage changes with Plaintiff.  (R. 442.)

On May 25, 2017, Dr. Sarmiento completed a "Mental Impairment Questionnaire"[7] regarding Plaintiff, whom the Doctor indicated he saw monthly.   (See R. 445-49.)   He identified Plaintiff's diagnoses as generalized anxiety disorder and PTSD, which were exacerbated by Plaintiff's back pain. (R. 445, 447). Dr. Sarmiento opined Plaintiff had moderate-to-marked limitations carrying out simple instructions, sustaining an ordinary routine, asking simple questions or requesting assistance, and adhering to basic standards of neatness. (R. 448).  The Doctor found Plaintiff exhibited marked limitations in all other areas of functioning, including:   understanding and memory;   concentration and persistence;  social interactions;  and adaptation.   (Id.)   He reported Plaintiff's limitations apply as far back as 1986.  (R. 449.)

The  record  also  contains  two  treatment  plans  for Plaintiff prepared by Parientes:[8] a January 1, 2017 plan (R. 436); and an April 8, 2017 plan (R. 443).   The second plan is,

---

[7] Said Questionnaire appears to be a form generated by Plaintiff's counsel.   (See, e.g., Questionnaire footer (indicating, inter alia, Questionnaire is copyrighted by Binder in Binder).)

[8]  Neither treatment plan identified an individual health care provider.

essentially, a copy of the first one. (Compare R. 436, with R. 443.) Both plans included, inter alia: Plaintiff's diagnosis of unspecified bipolar and related disorder and chronic PTSD; reporting Plaintiff last received outpatient treatment from 2002 through 2003 from Catholic Charities; reporting Plaintiff had received therapy in school since he was 13 years old; the stated treatment goal of stabilizing Plaintiff's mood through medical management and therapy; a three-month estimation to achieve the stated treatment goal; and, a recommendation of weekly treatment. (See id.)

Further, the record indicates, while he was incarcerated in 2019, Plaintiff suffered from anxiety, was assessed with generalized anxiety disorder, and was referred to a psychiatrist. (See R. 1578, 1580.) Moreover, after his release from custody, Plaintiff resumed therapy in June 2019, seeing LCSW Jean Schult ("LCWS Schult"). (See R. 1612, 1605-06.) His treatment was to be biweekly. (R. 1605.) In a June 21, 2019 "Psychiatric Assessment",[9] LCWS Schult diagnosed Plaintiff with bipolar disorder, including the description: "episode mixed severe with psychotic features". (R. 1605.) She reported, inter alia, Plaintiff: had frequent episodes where his bipolar disorder caused (1) behavior that

---

[9]  The Assessment form was from the Suffolk County Department of Social Services and was to be used as an assessment tool in determining Plaintiff's employability. (See R. 1605-06.)

interfered with his activities of daily living, and (2)
decompensation; and occasional episodes where his bipolar
disorder: (3) required either medical or psychiatric
hospitalization or emergency room visits, and (4) suicide
attempts. (R. 1606.) LCWS Schult further identified functional
limitations Plaintiff displayed, which would either be moderately
limiting (i.e., unable to function 50% of the time) or very
limiting (i.e., unable to function 75% or more of the time). (See
id.) Those functions for which Plaintiff would be moderately
limited, LCWS Schult identified: interacting appropriately with
others; maintaining socially appropriate behavior; and, the
ability to use public transportation. (Id.) And, those functions
for which Plaintiff would be very limited, LCWS Schult identified:
understanding and remembering both simple and complex
instructions; maintaining attention and concentration; and,
performing low stress, simple tasks. (Id.) To the inquiry whether
Plaintiff was able to participate in employment, among other
activities, LCSW Scult responded "No"; she suggested a
re-evaluation after 12 months. (Id.)

C.    Plaintiff's Testimony

When first questioned about his last job, Plaintiff
initially testified he had worked about a year prior to the August
2019 hearing. (See Disability Hr'g Tr., R. 77, at-78.) However,
per his review with his attorney of his earning statements, it was

24

apparent Plaintiff had worked for a livery company in the prior year, from mid-December 2018 until mid-January 2019, approximately a month and just prior to being incarcerated on a robbery charge. Given the exchange between Plaintiff and the ALJ at the Disability Hearing, it is apparent that, while the ALJ believed his "question was very simple" (R. 78), Plaintiff was confused about, and did not remember, specific dates regarding his employment (see R. 77-79).

Purportedly in an effort to clarify Plaintiff's earning history, the ALJ asked Plaintiff the reason for his 2019 incarceration. (R. 96.) The following exchange occurred:

> Q    Now, why were you in jail for that five- to six-month period?
> A    I had a blackout and I crashed into a building.
> Q    So, you were driving a vehicle?
> A    Yes.
> Q    Was it a livery car?
> A    No.  It was my own, personal car.
> Q    It must be tough in Suffolk County.  They put you in jail for having an accident?
> A    Yeah.
> Q    Why?
> A    They said that I took stuff out of the store, which I don't really remember. Until they showed me the video, I didn't believe that I'd did it.  You know, because like I said, I had a blackout, and I didn't, I was like, are you kidding me?
> Q    All right, so they didn't put you in jail because you blacked out and had an accident.  Sounds like they put you into jail for some sort of robbery?
> A    Yeah, that's what they said that I did.

25

(R.96-97 (emphases added).)

The ALJ proceeded to inquire about Plaintiff's use of a cane and oxygen while driving for the livery company.  (R. 80.) Plaintiff first testified he used the cane when he was employed as a livery driver; upon further inquiry of his counsel, Plaintiff elucidated that his use of the cane was an added reason the livery company no longer wanted him driving for it.  (R. 80.)  In response to a follow-up question by the ALJ, Plaintiff also testified a Dr. Michalowicz prescribed a cane for Plaintiff's use in either January or February of 2018.  (R. 93-94.)  The ALJ posed no other cane-related questions to Plaintiff.

As for the oxygen, Plaintiff stated he was not using it when he was a livery driver.  (See id.)  He testified to being on oxygen while incarcerated for an approximate five-month period. (R. 97.)  Plaintiff also approximated he was "put on" oxygen approximately nine months prior to the Disability Hearing, but he vacillated as to when exactly that placement occurred.  (See R. 80.)  Plaintiff continued; he believed it was sometime in March when he began using oxygen, i.e., five-and-a-half months prior to the disability hearing.  (See id.)  Additionally, Plaintiff testified he uses oxygen 24 hours per day.  (R. 86; see also R. 97.)

Upon examination by his counsel, Plaintiff testified as to reasons he believed he was unable to work, e.g.: back problems;

problems remembering, i.e., "a lot of problems forgetting"; the
inability to sit or stand for long periods of time; being unable
to use his cane in the livery job; and, suffering carpel tunnel in
both hands. (R. 81-82.) Plaintiff further stated that, despite
physical therapy, aqua-physical therapy, pain medications, and
surgery, he continues to suffer from back pain and requires the
use of a cane "for walking and sitting, standing[, f]or
everything", both inside and outside. (R. 83, 84.) Relatedly,
Plaintiff explained he is morbidly obese and has bad knees; his
bad knees are another reason he uses a cane when walking. (R.
84-85.) Additionally, Plaintiff stated he has severe sleep apnea
which caused him: to have difficulty sleeping at night (R. 87); to
be tired throughout the day (R. 86); to fall asleep multiple times
throughout the day (R. 87); and, to have difficultly concentrating
and remembering (see id.). Further, Plaintiff explained he suffers
from psychiatric conditions; he has been diagnosed with bipolar
disorder and schizophrenia (R. 88), which causes him to rage and
experience blackouts (R. 89). Continuing, Plaintiff testified his
bipolar disorder causes him to make bad decisions without
considering their consequences and to suffer debilitating bouts of
depression, which can last several days. (R. 89-90.) He also
suffers from "real bad anxiety", which causes him to want to be
alone and to have altercations with strangers. (See id.)

Plaintiff testified he had resumed psychiatric treatment sometime in 2019. (R. 90.)

More generally, Plaintiff also testified to the following in response to his counsel's examination. He has difficultly walking due to back pain, getting winded, and having his legs "give out". (R. 91.) Further, since he cannot stand for long periods, Plaintiff explained he does not perform any of the household cooking, cleaning, or laundry. (Id.) And, another reason Plaintiff does not cook is his high distractibility, i.e., he forgets items on the stove which then burn. (R. 92.) Moreover, since he cannot walk around the store, Plaintiff stated he does not food shop. (R. 91.)

D.    The VE's Testimony

The ALJ presented the VE with three hypotheticals. For each hypothetical, the VE was (1) to start with the premise that the hypothetical individual was of Plaintiff's age, education, and work experience, and (2) opine whether there were any jobs in the national economy such an individual could perform. In the first hypothetical, the VE was to further assume the individual could perform work at a light exertional level and, with, among other limitations, could "stand and/or walk for up to four hours in an eight-hour workday", and could "occasionally deal with coworkers and the public". (R. 99-100.) Focusing upon the standing limitation, the VE identified three jobs: screener/inspector for

28

printed circuits; document preparer; and, final assembler. (R. 100-01.) The VE testified, given consideration of the standing limitation, as well as the limitation regarding interacting with coworkers and the public, she identified these jobs based upon her professional experience; her identification was not consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations ("SCO"). (R. 101.)

In the second hypothetical, the same presumptions were presented to the VE with the additional consideration that the hypothetical individual "must be allowed to use oxygen during the eight-hour workday." (Id.) The VE testified "[u]sing oxygen is not something that's addressed by the DOT" and it "would usually require some kind of accommodation before the person would be employed." (R. 102.) Further, she explained, inquires would have to be made of employers since "[t]here would be some minor accommodation in that instance." (R. 101.) Nonetheless, the VE testified screener/inspector and final assembler jobs would continue to be available in the same numbers but, she would substitute an optical products polisher job for the document preparer job. (R. 101-102.) Her testimony was not "consistent to DOT and SCO"; instead, it was based upon the VE's professional experience. (R. 102.)

In the third hypothetical, again beginning with the same presumptions, and with the presumption that the hypothetical

29

individual had the same RFC as the second hypothetical, the ALJ added the additional considerations that said individual: "must be allowed to alternate between standing and sitting every 10 minutes while remaining on task"; "ambulates with a cane"; requires more than customary breaks; "[w]ould be off task more than 20 percent of the workday"; and "would be absent from work for four or more days per month". (R. 103.) With those presumptions, the ALJ inquired whether there are any jobs in the national economy such an individual could perform, to which the VE responded there were not. (See id.) The VE's response to the third hypothetical was based upon her professional experience and not the DOT or SCO. (See id.)

Upon Plaintiff's counsel's cross-examination regarding the added factor of oxygen use, the VE clarified that "[s]pecial accommodation is usually required for using an oxygen tank throughout the day for various reasons." (R. 104.) She further stated this special accommodation takes the jobs she identified out of the competitive level. (See id.) And, as to the first hypothetical and use of a cane, the VE testified, "If they[, i.e., such hypothetical individuals,] have to, if they're going to be standing part of the time on those jobs to change positions and they require a cane when standing, they will not be able to perform any of those jobs." (R. 105.)

III. <u>The ALJ Decision</u>

    A.   <u>Generally</u>

        In an August 19, 2019 decision, the ALJ found Plaintiff was not disabled (hereafter, the "ALJ Decision"). (R. 10-25; <u>see also</u> <u>id.</u> at 26-31 (List of Exs.).) More specifically, while the ALJ found Plaintiff suffered from the severe impairments of, <u>inter alia</u>, lumbar degenerative disc disease with spondylosis and compression status post laminectomy, bipolar disorder, PTSD, and anxiety disorder (R. 12), he also found said impairments or combinations thereof did not meet or medically equal "the severity of one of the listed impairments [found] in 20 CFR Part 404, Subpart P, Appendix 1" (<u>id.</u> at R.13 (bold emphasis omitted)). Further, upon the record presented, the ALJ found Plaintiff maintained a residual functional capacity ("RFC") to perform sedentary work "as defined in 20 CFR 416.967(a)" with further exceptions, including that Plaintiff could "stand and/or walk for up to 4 hours in an 8-hour workday". (R. 16 (bold emphasis omitted).) Moreover, the ALJ determined the record supported finding Plaintiff was "able to understand and remember simple instructions, make simple work[-]related decisions, carry-out simple instructions, c[ould] occasionally deal with changes in a routine work setting, and c[ould] occasionally deal with coworkers and the public." (<u>Id.</u> (bold emphasis omitted).) The ALJ elucidated that, in making this finding, he:

> considered all symptoms and the extent to
> which these symptoms can reasonably be
> accepted as consistent with the objective
> medical evidence and other evidence, based on
> the requirements of 20 CFR 416.929 and SSR 16-
> 3p. [He] also considered opinion evidence in
> accordance with the requirements of 20 CFR
> 416.927.

(Id. at 16-17.)  The ALJ explained he was required to engage in a

two-step process when considering a claimant's symptoms:  (1) "it

must first be determined whether there is an underlying medically

determinable physical or mental impairment(s)--i.e., an

impairment(s) that can be shown by medically acceptable clinical

or laboratory diagnostic techniques--that could reasonably be

expected to produce the claimant's pain or other symptoms"; and

(2) "[s]econd, once an underlying physical or mental impairment(s)

that could reasonably be expected to produce the claimant's pain

or other symptoms has been shown, [an ALJ] must evaluate the

intensity, persistence, and limiting effects of the claimant's

symptoms to determine the extent to which they limit the claimant's

functional limitations."  (Id. at 17.)  Further, as to the second

prong of the analysis, "whenever statements about the intensity,

persistence, or functionally limiting effects of pain or other

symptoms are not substantiated by objective medical evidence, [an

ALJ] must consider other evidence in the record to determine if

the claimant's symptoms limit the ability to do work-related

activities."  (Id.)

B.    <u>Regarding Plaintiff's Lower Back Pain</u>

Particular to Plaintiff, the ALJ chronicled Plaintiff's musculoskeletal impairments for a truncated period of time, <u>i.e.</u>, from December 2016 to November 15, 2017.  (<u>See</u> R. 17-18.)  The ALJ first stated Plaintiff had MRIs of his lumbar spine on December 1, 2016, and July 25, 2017, with both evincing degenerative changes and foraminal stenosis.  (R. 17.)  Similarly, a December 31, 2016 MRI of Plaintiff's thoracic spine revealed degenerative changes of the intervertebral discs.  (<u>Id.</u>)  And, a December 19, 2016 electromyogram study of the middle section of Plaintiff's spinal column showed "showed chronic multilevel bilateral lumbosacral radiculopathy . . . but no focal mononeuropathy of either leg."  (R. 18.)

The ALJ then summarized a series of five doctor interactions Plaintiff had which were related to his back.  The <u>first</u> was Plaintiff's January 20, 2017 visit with Dr. Daniel Brandenstein.  (R. 18.)  The ALJ reported: Plaintiff presented "with sharp and stabbing pain localized to the lower back", which pain Plaintiff rated "as 9/10 at its worst" (<u>id.</u>); Plaintiff stated his pain "worsened with walking, standing, sitting and lying down", and prolonged periods of sitting also worsen the pain, which was "relieved with rest" (<u>id.</u>); and, given Plaintiff's presentation and the symptoms of which he complained, Dr. Brandenstein assessed neurogenic claudication.  (<u>See id.</u>)

The <u>second</u> was Dr. Brandenstein's March 13, 2017 surgery on Plaintiff "by lumbar laminectomy of the L2, L3[,] and L4 vertebrae, partial laminectomy of the L1 and L5 vertebrae[,] and repair of the incidental durotomy of the caudal aspect of the L4 vertebra." (R. 18.) The <u>third</u> was the following March 14, 2017 review by Dr. Gerald Schulze of the duplex ultrasound of Plaintiff's lower extremities, which showed "no acute deep vein thrombosis within the visual venous system of the lower extremities." (<u>Id.</u>)

The <u>fourth</u> doctor's encounter the ALJ recognized was Plaintiff's October 11, 2017 visit with Dr. Phillippe Vailancourt during which Plaintiff complained of chronic low back pain. (R. 18.) During said visit, Plaintiff also complained: his back pain extended down his right leg to his knee; tingling in all toes on his right foot; and, his pain was "worse with sitting or standing too long or walking more than short distances." (<u>Id.</u>) In addition to back pain, the Doctor noted Plaintiff suffered joint pain and swelling, and muscle weakness; otherwise, the Doctor's review of Plaintiff's body systems was unremarkable". (<u>Id.</u>)

The <u>fifth</u> and final doctor encounter regarding Plaintiff's lower back pain which the ALJ discussed was Plaintiff's November 15, 2017 follow-up visit with Dr. Daniel Kohane. (R. 18.) At that visit, the Doctor reviewed with Plaintiff the results of an MRI the Doctor had ordered after his October 16, 2017

34

examination of Plaintiff at which Plaintiff presented with complaints of knee pain. (See R. 1497.) The ALJ provided the MRI findings contained in Dr. Kohane's "Visit Notes" under the "Tests" section. (Compare ALJ Decision at R. 18, with Dr. Kohane's Nov. 15, 2017 "Visit Notes" at R. 1468.[10]) The ALJ further stated Dr. Kohane's examination revealed Plaintiff's: "lower extremities were normal; lumbar flexion at 20 percent with pain; extension at 0 percent with pain; bilateral lumbar paraspinal tenderness, multiple trigger points were palpable; thoracolumbar spine was positive for Kemp's maneuver bilaterally; facet joints painful with palpation bilaterally, but straight leg raise were negative." (R. 18 (citing Ex. B26F at pp. 6-7).)

Based upon this limited assessment of the evidence, the ALJ found Plaintiff's "lumbar degenerative disc disease with spondylosis and compression fracture status post laminectomy has produced functional limitations that reduced his exertional capacity to the light RFC." (R. 18.) But, because Plaintiff "had negative straight leg raise testing and retained the strength of his lower extremities," the ALJ also found "a sedentary RFC is not warranted." (Id.) Yet, he also concluded Plaintiff's "functional

---

[10] In the ALJ Decision, the ALJ cites to "Ex.B26F" at page 7; said citation is located in the Administrative Transcript at R. 1468. For clarity: Exhibit B26F comprises of 57 pages of documents; they are the "Office Treatment Records" of Dr. Kohane. (See R. 30.) Exhibit B26F includes Dr. Kohane's full Visit Notes from November 15, 2017, in addition to Visit Notes from other dates.

limitations brought on by pain and limitations in his range of motion warrant further nonexertional limitations that address postural movements as defined in the RFC assessment to erode the occupational base." (R. 18-19.)

C. Regarding Plaintiff's Mental Health

The ALJ narrated Plaintiff's mental health treatment as follows, based primarily upon treatment notes from two dates. First, from the December 10, 2016 "Intake Notes" of Parientes of Suffolk, a medical group specializing in counseling and social work, the ALJ stated Plaintiff had presented with "symptoms of depression and anxiety interspersed with periods of bursts of energy" and reported to the Licensed Clinical Social Worker ("LCSW") that he does not like crowds and had been diagnosed with agoraphobic and antisocial personality disorder. (R. 20.) The LCSW diagnosed Plaintiff with unspecified bipolar and related disorder, as well as agoraphobia; Plaintiff was prescribed medication management and therapy to stabilize his mood. (Id.)

Second, relying upon the notes of Nurse Practitioner ("NP") Eva McDowall, of Parientes of Suffolk, the ALJ stated Plaintiff had reported on December 22, 2016, that he suffered from agoraphobia with anxiety and depression, and that he required new prescriptions. (R. 20.) The ALJ also included NP McDowall: prescribed Plaintiff medications to treat his mental health conditions, i.e., Venlafaxine, Buspar, and Clonazepam; and,

36

diagnosed Plaintiff with generalized anxiety disorder and chronic post-traumatic stress disorder.[11]  (Id.)

Finally, the ALJ concluded:  "On April 24, 2017, Parientes of Suffolk terminated [Plaintiff] from treatment because of insufficient progress.  The [Plaintiff] missed 6 of his last 8 appointment."  (R. 20.)  From this background, the ALJ:

> gave [Plaintiff's] subjective allegations of functional limitations resulting from his bipolar disorder, post-traumatic stress disorder[,] and anxiety disorder the benefit of the doubt to include nonexertional limitations to limit [Plaintiff] to simple skills, occasional changes in a routine work setting[,] and occasional dealing with coworkers and the public to further erode the occupational base.

(Id.)  The ALJ buttressed his RFC determination by relying upon the opinions of a non-examining psychologist, Dr. T. Harding, who reviewed Plaintiff's records through March 3, 2017.  (See R. 22; cf. R. 145.)  The ALJ also asserted his RFC determination, i.e., Plaintiff was "able to perform basic skills in a low contact setting, was supported by Dr. Harding's 2017 opinion because Plaintiff "exhibited such work capacity by driving for" the livery company for an approximate one-month period.  (R. 22.)

---

[11]  While it is unclear from his Decision what the relevant is to the determination of disability or entitlement to benefits, the ALJ also made the point of stating NP McDowall noted Plaintiff both had been "recently released from prison after three years" and was "currently on parole with a history of two imprisonments".  (R. 20.)

Conversely, the ALJ found the limitations identified by Dr. Sarmiento were "not consistent and not supported by the objective clinical and diagnostic finding," i.e., Plaintiff's treatment at Parientes of Suffolk, "as well as the records review findings" of non-examining psychiatric consultant, Dr. Harding. (R. 22 (citing Ex. B8F, Dr. Sarmiento's May 21, 2017 "Mental Impairment Questionnaire").)    Therefore, the ALJ gave Dr. Sarmiento's limitations little weight.    (Id.)

D.    Regarding the VE's Testimony

Since Plaintiff's ability to perform all or substantially all of the requirements of sedentary work was "impeded by additional limitations", in order "[t]o determine the extent to which these limitations erode the unskilled sedentary occupational base," the ALJ posed several hypothetical scenarios to the VE. (R. 24.)    The ALJ found the three jobs the VE identified for the hypothetical individual of Plaintiff's age, education, work experience, and RFC, i.e., a screener/inspector, a document preparer, and a final assembler, was consistent with the information contained in the DOT and with the VE's professional experience.    (See id.)    However, as to the VE's response to the ALJ's hypothetical involving such an individual with the added requirement that the individual required using "oxygen during an 8-hour workday", to which the VE testified on cross-examination "that the use of oxygen is a special accommodation by employers

and would actually preclude competitive employment," without explanation, the ALJ found the VE's "testimony in response to [the oxygen-use-related] hypothetical unpersuasive."[12]  (Id.)  Hence, relying upon the VE's testimony as to the ALJ's first hypothetical, the ALJ concluded, considering Plaintiff's age, education, work experience, and RFC, Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and, therefore, is "not disabled".  (Id.; see also R. 25.)

IV.  Post-ALJ Decision

    A.    Subsequent Procedural History

        On September 9, 2020, the Agency's Appeals Council denied Plaintiff's request for review; therefore, the ALJ Decision became the final decision of the Commissioner.  (R. 1-3.)

        On November 10, 2020, Plaintiff initiated the instant action. (See Compl.)  Thereafter, on November 29, 2021, Plaintiff moved for judgment on the pleadings, requesting a reversal of the ALJ Decision and an award of benefits or, alternatively, the case be "remanded for a new hearing and decision . . . ."  (Support Memo at 30.)  On February 15, 2022, the Commissioner crossed-moved for judgment on the pleadings, asserting the ALJ Decision should

---

[12]  In the ALJ Decision, the ALJ did not address the third hypothetical scenario, i.e., the cane-use hypothetical, he presented to the VE during the Disability Hearing.

be affirmed and this action be dismissed.  (See Cross-Support Memo at 29.)

    B.   <u>The Parties' Positions</u>

      Plaintiff puts forth two arguments in support of his Motion; the ALJ: (1) failed to properly weigh the medical opinion evidence, especially that of his treating physicians (<u>see</u> Support Memo at 17-20, 21-22 (re: orthopedic surgeon Dr. Brandenstein), and at 22-24 (re: treating psychiatrist Dr. Sarmiento); <u>see also</u> Reply at 1-2; 4-5 (arguing ALJ failed to consider Plaintiff's longitudinal medical record)), whose opinions the ALJ contended where not consistent with the record evidence, but instead improperly relied upon the opinions of non-examining doctors (<u>see</u> <u>id.</u> at 20 (re: Plaintiff's musculoskeletal impairments), and at 26 (re: Plaintiff's mental impairments)); and (2) failed to properly evaluate Plaintiff's subjective statements, with the ALJ having failed to adequately articulate his rationale for his assessment of Plaintiff's subjective complaints, especially highlighting the lack of "any reasons for discounting [Plaintiff]'s statements regarding his mental impairments."  (<u>Id.</u> at 29; <u>see also</u> <u>id.</u> at 29-30; Reply at 5 (asserting "the ALJ failed to build a bridge between the summary of the evidence regarding [Plaintiff]'s mental impairments and a finding that Plaintiff's allegations [we]re not credible").)

In response, the Commissioner cross-moved for judgment on the pleadings pursuant to Rule 12(c) asserting: the ALJ Decision should be affirmed; Plaintiff's Motion should be denied; and, thereafter, this action should be dismissed. (See Cross-Support Memo at 29.) In opposition to Plaintiff's Motion, the Commissioner asserts: (1) "the ALJ properly considered the medical-opinion evidence and sufficiently explained his reasons for the weight assigned to the various opinions" (id. at 18; see also id. at 26); (2) regarding Plaintiff's back impairment, in finding Dr. Brandenstein's opinions to be inconsistent, "a searching review of the record establishes that the substance of the treating physician rule was not traversed" by the ALJ (id. at 22), and as to Plaintiff's use of a cane, there is no medical evidence supporting its required use (see id. at 28); and (3) regarding Plaintiff's mental impairment, the evidence showed Plaintiff received inconsistent mental health treatment over a two-year period, which inconsistency, under the regulations, is a basis to disregard an individual's subjective complaints, but, nonetheless, the ALJ afforded Plaintiff the benefit of the doubt by including certain RFC limitations (see id. at 27 (including limitations as to understanding and remembering simple instructions, making simple work-related decisions, carrying out simple instructions, occasionally dealing with changes in a routine work setting, and

occasionally dealing with coworkers and the public); see also id. at 29.)

DISCUSSION

I.  Standard of Review

In Brown v. Commissioner of Social Security, 708 F. Supp. 3d 234 (E.D.N.Y. 2023), Honorable Kiyo A. Matsumoto of this District thoroughly and succinctly articulated the standard the Commissioner must follow in determining a claim of disability, see id. at 241-42, as well as the standard a reviewing district court must utilize when a claimant challenges the Commissioner's determination that the claimant is not disabled, see id. at 242-43.  This Court adopts same and incorporates by reference those standards herein.

Generally speaking, in reviewing a final decision of the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  Rucker v. Kijakazi, 48 F.4th 86, 90-91 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)).  District courts will overturn an ALJ's decision only if the ALJ applied an incorrect legal standard, or if the ALJ's ruling was not supported by substantial evidence.  See id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)).

"[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

> In reviewing the Commissioner's decision:
>
>> "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is warranted where "'there are gaps in the administrative record or the ALJ has applied an improper legal standard'" and where "further findings or explanation will clarify the rationale for the ALJ's decision." Coleson v. Comm'r of Soc. Sec., No. 18-CV-02862, 2020 WL 1989280, at *3 (E.D.N.Y. Apr. 26, 2020) (quoting Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999)).

Blowe v. Comm'r of Soc. Sec., No. 19-CV-2658, 2020 WL 3129062, at *4 (E.D.N.Y. June 12, 2020); see also Brown, 708 F. Supp. 3d at 243 ("Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision." (citing Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).

> Relatedly, as this Court stated in Kelly v. Commissioner of Social Security:
>
>> It is well-established:
>>
>>> Social Security proceedings are non-adversarial and the ALJ is obliged "to investigate the facts and develop the arguments both for and against granting

43

benefits." <u>Sims v. Apfel</u>, 530 U.S.
103, 111, 120 S. Ct. 2080, 147 L.
Ed. 2d 80 (2000) (citation
omitted). This obligation applies
even if the claimant is represented
by counsel. <u>See, e.g.</u>, <u>Rosa v.
Callahan</u>, 168 F.3d 72, 79 (2d Cir.
1999) (citing <u>Perez v. Chater</u>, 77
F.3d 41, 47 (2d Cir. 1996)). The
ALJ's duty to develop the record
has been described as a "bedrock
principle of Social Security
law." <u>Batista v. Barnhart</u>, 326 F.
<u>Supp. 2d 345, 353 (E.D.N.Y. 2004)</u>
(citing <u>Brown v. Apfel</u>, 174 F.3d 59
(2d Cir. 1999)).

<u>Michelle C. v. Comm'r of Soc. Sec.</u>, No. 23-
CV-7144, 2024 WL 1706000, at *5 (S.D.N.Y. Apr.
3, 2024), <u>report and recommendation adopted</u>,
2024 WL 1702127 (S.D.N.Y. Apr. 18, 2024).
     "Whether the ALJ has satisfied this duty
to develop the record is a threshold question.
Before determining whether the Commissioner's
final decision is supported by substantial
evidence . . . the court must first be
satisfied that the ALJ . . . completely
developed the administrative record."
<u>Campbell v. Comm'r of Soc. Sec.</u>, No. 19-CV-
4516, 2020 WL 4581776, at *14 (S.D.N.Y. Aug.
10, 2020); <u>see also</u> <u>Telesco v. Comm'r of Soc.
Sec.</u>, 577 F. Supp. 3d 336, 353 (S.D.N.Y. 2021)
(finding, even though claimant did not
challenge sufficiency of the record, ALJ erred
by failing to adequately develop the record);
<u>Berte v. Comm'r of Soc. Sec.</u>, No. 20-CV-2889,
2023 WL 2760515, *3 (E.D.N.Y. Apr. 3, 2023)
(remanding case where ALJ based his non-
disability determination on deficiencies in
claimant's medical records because ALJ failed
to develop said record) (collecting cases);
<u>Sanchez v. Saul</u>, No. 18-CV-12102, 2020 WL
<u>2951884, at *23 (S.D.N.Y. Jan. 13, 2020)</u> ("As
a threshold matter, and regardless of the fact
that Plaintiff did not raise an express
challenge to the adequacy of the Record, this
Court must independently consider the question

of whether the ALJ failed to satisfy his duty to develop the Record."), <u>report and recommendation adopted</u>, 2020 WL 1330215 (S.D.N.Y. Mar. 23, 2020). "Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings." <u>Diano v. Comm'r of Soc. Sec.</u>, No. 19-CV-2265, 2020 WL 13555076, at *16 (citing <u>Rosa v. Callahan</u>, 168 F.3d 72, 83 (2d Cir. 1999) (finding remand "particularly appropriate" where ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors)) (collecting cases).

<u>Kelly v. Comm'r of Soc. Sec.</u>, No. 20-CV-5318, 2024 WL 5120051, at *9 (E.D.N.Y. Dec. 16, 2024); <u>Rivers v. Kijakazi</u>, No. 21-1935-CV, 2023 WL 2485467, at *1 (2d Cir. Mar. 14, 2024) (summary order) ("An ALJ's failure to develop the record warrants remand." (citing Rosa, 168 F.3d at 79-80)); <u>Calicchio v. Comm'r of Soc. Sec.</u>, No. 24-CV-1065, 2025 WL 1489763, *5 (E.D.N.Y. May 23, 2025) (same; quoting <u>Kelly</u>); <u>see also generally</u> <u>Calicchio</u>, 2025 WL 1489763, at *13; <u>Rodriguez v. Comm'r of Soc. Sec. Admin.</u>, No. 24-CV-0167, 2025 WL 660265, at *3, *5 (E.D.N.Y. Feb. 28, 2025) (same; quoting and citing <u>Kelly</u>).

[Remainder of page intentionally left blank.]

II.  The Instant Case[13]

        Having reviewed the record presented, it is abundantly unclear to the Court how the ALJ arrived at his determination of non-disability notwithstanding his claim to have carefully considered the evidence.  (See ALJ Decision, R. 10.)  Indeed, there is a difference between considering evidence and articulating how the Agency considered evidence.  See 82 Fed. Reg. 5844-01, at 5858. The Court finds the ALJ Decision is deficient, lacking needed rationales, thereby thwarting its ability to engage in any meaningful review of said Decision.  Relatedly, it is readily apparent the ALJ did not comply with the applicable treating physician rule, failing to afford the proper weight to the opinions of Plaintiff's treating physicians or providing good reasons for his discounting of those doctors' opinions.  See, e.g., Gagovits

---

[13]

        For claims filed prior to March 27, 2017, like this one, the ALJ's findings of fact are constrained by "the treating physician rule." Colgan v. Kijakazi, 22 F.4th 353, 359 & 359 n.2 (2d Cir. 2022) (citing 20 C.F.R. § 404.1527(c)(2)).  "The treating physician rule, as its name connotes, states that the medical opinion of a claimant's treating physician must be given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" Id. at 359-60 (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)).

Rivers, 2023 WL 2485467, at *2.

v. Colvin, No. 15-CV-3246, 2016 WL 4491537, at *8 (E.D.N.Y. Aug. 25, 2016) (explaining "[w]hen an ALJ does not accord controlling weight to the opinion of a treating physician", he must consider the so-called Burgess Factors and "must also set forth 'good reasons" for not crediting the opinion or a plaintiff's treating physician" (citations omitted)); see also Arias v. Kijakazi, 623 F. Supp. 3d 277, 284 (S.D.N.Y. 2022) (same). Moreover, it appears the ALJ has cherry-picked evidence from the record, which is impermissible. See Javon W. v. Comm'r of Soc. Sec., 629 F.Supp.3d 62, 67 (W.D.N.Y. 2022) ("[T]he ALJ may not 'cherry pick' evidence." (citation omitted)) (collecting cases). In a similar vein, the Court finds the ALJ did not properly develop the record notwithstanding his duty to do so. See Kelly, 2024 WL 5120051, at *9. The Court highlights several issues with the ALJ Decision necessitating a remand.[14] See Rivera, 2020 WL 8167136, at *14; see also Brown, 708 F. Supp. 3d at 243.

A.   Noncompliance with the Treating Physician Rule

An ALJ must evaluate every medical opinion received. Rodriguez v. Colvin, No. 12-CV-3931, 2014 WL 5038410, at *17 (S.D.N.Y. Sept. 29, 2014). Under the regulations applicable at the time [Plaintiff]'s disability claim was filed, a treating

---

[14] For clarity: There are other problems with the ALJ Decision, e.g., the ALJ's failure to articulate his reasons for finding unpersuasive the VE's testimony in response to the proffered second hypothetical (see R. 24); however, having determined remand is warranted for other reasons, the Court has not addressed all the issues it found with the ALJ Decision. (See, supra, at 65.)

physician's opinion will be given controlling
weight if it is "well-supported by medically
acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the
other substantial evidence in [the] case
record." 20 C.F.R. § 416.927(c)(2); see also
Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir.
2008). Conversely, an ALJ is not required to
assign a treating physician's opinion
controlling weight when it is contradicted by
substantial evidence in the record. Veino v.
Barnhart, 312 F.3d 578, 588 (2d Cir. 2002)
(noting that a treating physician's opinion is
not controlling when contradicted "by other
substantial evidence in the record").

When an ALJ gives a treating physician's
opinion less than controlling weight, the ALJ
must give "good reasons" for doing so. 20
C.F.R. § 416.927(c)(2) (stating that the
agency "will always give good reasons in our
notice of determination or decision for the
weight we give [the claimant's] treating
source's medical opinion"); Snell v. Apfel,
177 F.3d 128, 133 (2d Cir. 1999); Schaal, 134
F.3d at 505. "Failure to provide 'good
reasons' for not crediting the opinion of a
claimant's treating physician is a ground for
remand." Snell, 177 F.3d at 133; see also
Schaal, 134 F.3d at 505 ("Commissioner's
failure to provide 'good reasons' for
apparently affording no weight to the opinion
of plaintiff's treating physician constituted
legal error").

If the ALJ decides not to give
controlling weight to a treating physician's
opinion, the ALJ must determine how much
weight, if any, to give that opinion.
Estrella v. Berryhill, 925 F.3d 90, 95 (2d
Cir. 2019). In doing so, the ALJ must
"explicitly consider" the following, non-
exclusive "Burgess factors": "(1) the
frequen[cy], length, nature, and extent of
treatment; (2) the amount of medical evidence
supporting the opinion; (3) the consistency of
the opinion with the remaining medical
evidence; and (4) whether the physician is a
specialist." Selian, 708 F.3d at 418 (citing

48

> Burgess, 537 F.3d at 129 (citing 20 C.F.R. §
> 404.1527(c)(2))). While failure to explicitly
> apply the Burgess factors is a procedural
> error, a reviewing court will not reverse the
> Commissioner's decision when the Commissioner
> has given "good reasons" for its weight
> assignment. Estrella, 925 F.3d at 96. "Good
> reasons" are reasons that assure the reviewing
> court that "the substance of the treating
> physician rule was not traversed." Id.

Arias, 623 F. Supp. 3d at 284.

Here, the ALJ failed to give controlling weight to the
opinions of Plaintiff's treating surgeon, Dr. Brandenstein. (See
ALJ Decision, R. 22.) Yet, in doing so, he also failed to
explicitly discuss the requisite Burgess Factors. (See id.) For
example, missing from the ALJ Decision is any discussion of the
frequency, length, nature, and extent of Dr. Brandenstein's
treatment of Plaintiff; nor did the ALJ address the fact that the
Doctor specialized in spinal and orthopedic surgeries.
Continuing, without citation, the ALJ baldly asserted the
limitations Dr. Brandenstein identified in his Spinal Impairment
Questionnaire were, inter alia, "not consistent with other medical
providers' findings and not supported by the objective clinical
and diagnostic findings." (Id.) Yet, relatedly, to the extent
the ALJ discounted Dr. Brandenstein's limitations because, shortly
after surgery, Plaintiff reported some relief (see id.), the ALJ
failed to reconcile the record evidence that Dr. Brandenstein
advised Plaintiff of this potential temporary outcome, which came

to fruition when, post-surgery, Plaintiff once more experienced back pain.  (See supra at 16-18.)  At bottom, in the absence of "good reasons" for the weight he assigned Dr. Brandenstien's opinions, this Court is without assurance that the substance of the treating physician rule was not traversed by the ALJ.  See Arias, 623 F. Supp. 3d at 284.  Left with such a predicament, remand is warranted.

Similarly, as to the limitations of Dr. Sarmiento, a psychiatrist with Parientes, the group through which Plaintiff had received mental health treatment in late 2016 through early 2017, the ALJ gave them limited weight.  In a cursory manner, the ALJ discounted Dr. Sarmiento's identified limitations on the basis of Plaintiff having "failed to show up to the majority of his therapy appointments" and the "records review findings of the Psychiatric Consultant, Dr. Harding."  (Id.)  Once more, however, the ALJ woefully failed to discuss the required Burgess Factors in making this determination.  But, "[a]dherence to the treating physician rule is 'all the more important in cases involving mental health.'" Arias, 623 F. Supp. 3d at 284 (quoting Flynn v. Comm'r of Soc. Sec. Admin., 729 F. App'x 119, 122 (2d Cir. 2018)).

Moreover, of significance, in the ALJ Decision, the ALJ gave short shrift to the records of NP MacDowall, who was also a Patientes provider treating Plaintiff during the relevant 2016-2017 time-period.  Inexplicably, the ALJ's focus appears to be on

NP MAcDowall's passing notations regarding Plaintiff's penal-related history and not her professional opinions.  (See ALJ Decision, R. 20.)   However, since both Dr. Sarmiento and NP MacDowall were working in the same mental health group and treating Plaintiff during the same time frame, NP MAcDowall's records were relevant and should have also been considered.  See, e.g., Arias, 623 F. Supp. 3d at 285 (instructing "a longitudinal understanding of the claimant's impairment is particularly important with respect to mental health conditions" (citations omitted)).  Indeed, given the holistic review which is to be undertaken by an ALJ, the records of Dr. Sarmiento and NP MacDowall should have been reviewed in tandem.  See, e.g., generally Riaz v. Comm'r of Soc. Sec., No. 20-CV-8418, 2022 WL 4482297, at *4 (S.D.N.Y. Sept. 27, 2022) (in discussing new regulations, explaining the "consistency" factor "evaluates medical opinions in a holistic context, considering 'how well a medical source is supported, or not supported, by the entire record'" (citation omitted)).[15]  Doing so would have encompassed consideration of many of the necessary Burgess Factors, e.g., the frequency, length, nature, and extent of treatment, as well as the amount of medical evidence supporting

---

[15]  The Court notes that while the new regulations have eliminated the "treating physician" rule, courts have observed "the factors under the new regulations 'are very similar to the analysis under the old treating physician rule.'"  Armstead v. Comm'r of Soc. Sec., No. 20-CV-2841, 2024 WL 5077582, at *14 (E.D.N.Y. Dec. 11, 2024) (citation omitted; collecting cases).

Dr. Sarmiento's opinion. However, finding the ALJ's review of the Patientes records was myopic, the Court is unable to determine whether the ALJ properly assessed Dr. Sarmiento's opinion, and whether that assessment encompassed consideration of the records of NP MacDowall, Dr. Sarmiento's colleague, who was also treating Plaintiff at the same time as and, apparently, in conjunction with, Dr. Sarmiento. Cf., e.g., Poceous v. Comm'r of Soc. Sec., No. 20-CV-4870, 2024 WL 3029197, at *13 n.11 (stating "the Court is left with the impression the ALJ cherrypicked the record to choose what supported his RFC determination", thereby warranting remand); see also Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991) (stating an ALJ cannot simply "pick and choose" evidence in the record that supports his conclusion).

And, problematically, in discounted Dr. Sarmiento's limitations, the ALJ also relied upon the opinion of a non-examining psychiatric consultant. Yet, "it is well-established that the medical opinion of a non-examining medical expert is entitled to little weight, especially when a claimant's impairments are based upon his mental health." Armstead v. Comm'r of Soc. Sec., No. 20-CV-2841, 2024 WL 5077582, at *15 (E.D.N.Y. Dec. 11, 2024) (citing Skartados v. Comm'r of Soc. Sec., No. 20-CV-3909, 2022 WL 409701, at *9 (E.D.N.Y. Feb. 10, 2022). As this Court further elucidated in Armstead and as is relevant here:

Rather, "courts frequently find that RFC
determinations that depend entirely on the
opinions of non-examining experts and one-time
consultative examiners are not supported by
substantial evidence." Agostino v. Kijakazi,
No. 22-CV-7235, 2024 WL 1259247, at *5-6
(E.D.N.Y. Mar. 25, 2024) (internal quotation
marks omitted); cf. Estrella, 925 F.3d at 98
("We have frequently cautioned that ALJs
should not rely heavily on the findings of
consultative physicians after a single
examination." (internal quotation marks
omitted)); Fintz v. Kijakazi, No. 22-CV-0337,
2023 WL 2974132, at *5 (E.D.N.Y. Apr. 15,
2023) ("While heavy reliance on a one-time
examiner's opinion does not automatically
constitute a legal error, the Second Circuit
has warned that heavily relying on an examiner
who only examined a claimant once is
inadvisable."). "This concern is even more
pronounced in the context of mental illness
where . . . a one-time snapshot of a claimant's
status may not be indicative of h[is]
longitudinal mental health." Estrella, 925
F.3d at 98. This applies more so to a non-
examining consultant since, in cases where
mental health is the most limiting disability,
it is generally "improper to rely on the
opinion of a non-treating, non-examining
doctor[,] because the inherent subjectivity of
a psychiatric diagnosis requires the physician
rendering the diagnosis to personally observe
the patient." Ron I., 2024 WL 4678398, at *8
(citing Velazquez v. Barnhart, 518 F. Supp. 2d
520, 524 (W.D.N.Y. 2007)).

Id. (emphasis added). Because Dr. Harding was a non-examining

consultant, his disability determination "deserve[s] little weight

in the overall evaluation of disability." Id.; see also Soto v.

Comm'r of Soc. Sec., No. 19-CV-4631, 2020 WL 5820566, at *7 and

n.20 (E.D.N.Y. Sept. 30, 2020) (collecting cases in footnote).

And, the Court finds the ALJ's reliance on Plaintiff's subsequent

one-month stint as a livery driver, without more, does nothing to cure that defect.

Finally, the record evidence shows that, post-incarceration, Plaintiff once more pursued mental health treatment. Yet, there is little indication the ALJ took steps to develop the record in this regard; indeed, the ALJ Decision is silent as to Plaintiff's 2019 resumption of mental health treatment. Yet, the ALJ should have done so, and his failure in this regard is another basis for remand. See Armstead, 2024 WL 5077582, at *17; see also, e.g., Grady v. Comm'r of Soc. Sec., No. 20-CV-3739, 2024 WL 4607231, at *8-9 (E.D.N.Y. Oct. 28, 2024) (finding ALJ's failure to fully develop administrative record was a threshold basis to remand case) (collecting cases). Relatedly, as Plaintiff aptly argues:

> To the extent the ALJ attempted to suggest [Plaintiff]'s allegations are not credible because he has not had consistent treatment for his mental impairments, such a finding without more is insufficient. It is well-established that frequently individuals "who suffer[] from psychological and emotional difficulties . . . lack the rationality to decide" upon appropriate treatment measures.

(Reply at 6 (quoting Thompson v. Apfel, No. 97-CV-7697, 1998 WL 720676, *6 (S.D.N.Y. Oct. 9, 1998); further citations omitted). The Court does not disagree. See, e.g., Diano v. Comm'r of Soc. Sec., No. 19-CV-2265, 2020 WL 13555076, at *16 (E.D.N.Y. Dec. 2, 2020) (citing Rosa, 168 F.3d at 83 (finding remand "particularly

54

appropriate" where ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors)) (collecting cases).  Indeed, as this Court recently stated:

> Moreover, it has been "consistently recognized that 'an ALJ has a heightened duty to develop the record when a claimant asserts a mental impairment.'"  [Michelle C. v. Comm'r of Soc. Sec., No. 23-CV-7144, 2024 WL 1706000, at *6 (S.D.N.Y. Apr. 3, 2024), report and recommendation adopted, 2024 WL 1702127 (S.D.N.Y. Apr. 18, 2024)] (quoting Gabrielsen v. Colvin, No. 12-CV-5694, 2015 WL 4597548, at *4-5 (S.D.N.Y. July 30, 2015) (collecting cases)).  Indeed, "[t]his 'heightened duty' derives from the fact that a claimant's mental illness may greatly impede an evaluator's assessment of a claimant's ability to function in the workplace, thus necessitating a more thorough review."  Id. (quoting Piscope v. Colvin, 201 F. Supp. 3d 456, 462-63 (S.D.N.Y. 2016)).  In that vein, "[t]he duty to develop the record . . . includes the duty to re-contact physicians when needed to afford the claimant a full and fair hearing based on an adequately developed record." Id.

Grady, 2024 WL 4607231, at *8.  Thus, here, given the information before the ALJ, it was incumbent upon him to, at a minimum, further develop the record as to Plaintiff's more recent mental health treatment, which he failed to do.

    B.    Cherry-Picking: The ALJ's Limited Time Period Review

        Plaintiff argues the Commissioner's "obdurate focus on selected findings in treatment records from a two[-]month period is highly misleading regarding [his] functioning during the entire

period at issue, which runs from the time he filed his claim for
benefits in November 2016 through the date of the [ALJ Decision]
in August 2019." (Reply at 1.)  The Court agrees.  The ALJ focuses
almost exclusively upon the two-month subset of time, i.e., the
two-month period of time after the back surgery performed by Dr.
Brandenstein.  (See ALJ Decision at R.18.)  Yet, as Plaintiff
asserts, and the record medical evidence substantiates, despite a
temporary reprieve in back pain following his March 2017 back
surgery, thereafter, Plaintiff continued to experience back pain;
"[b]y April 21, 2017, [Plaintiff's] back pain had increased to 7
to 10mon a 10-point scale." (Reply at 2 (citing R. 495).)  Indeed,
the record establishes that, subsequently, Plaintiff consistently
complained of back pain, which did not improve.  (See, e.g., Reply
at 2 (asserting "due to lack of improvement in his pain,
[Plaintiff] was later advised to seek treatment with a spinal cord
stimulator, medial branch block injections, and strong opioids,
including Fentanyl patches and Oxycodone" (citing R. 1386, 880,
and 881, respectively)).)  By way of example and contrary to the
ALJ's summary of Plaintiff's November 2017 visit with Dr. Kohane,
among other things, in his "Visit Note", Dr. Koahne recorded
Plaintiff reporting pain at an "8/10" level and which was
radiating, constant, chronic, and worsens with activity.  (R.
1497.)  Further, Dr. Kohane also noted Plaintiff had an antalgic
gait and was using a cane; relatedly, he also recorded Plaintiff's

range of motion for both his knees as "grossly limited and with
pain". (R. 1498.)   Dr. Kohane also included his impressions
regarding Plaintiff's lumbar radiculitis—aka radicular pain:

> Low back pain remains constant severe and
> radicular.   Pain is affecting [Plaintiff's]
> daily life.   Despite having spine surgery he
> continues to have pain.   Does not want to have
> further surgery nor believes it will be
> beneficial.   MRI lumbar spine report reviewed
> with patient.     Minimal relief with
> conservative management.   Based on his
> findings I feel he will benefit from lumbar
> epidural steroid injection midline L5-S1
> levels for diagnostic purposes.    For
> conservative management recommend physical
> therapy weight loss program.   Medication
> management continue the same for now[;] he is
> using pain meds from outside pain provider.
> He is in agreement with this plan.

(R. 1498.)   The Doctor further stated Plaintiff's status
was "[w]orsening".   (Id.)   This record evidence, juxtaposed with
the ALJ's assessment, makes is abundantly unclear to the Court how
the ALJ arrived at his RFC assessment and his determination of
non-disability.   Hence, the Court concurs with Plaintiff's astute
argument:

> The ALJ was required to consider the
> longitudinal treatment record showing such
> significant findings rather than focusing on
> [Plaintiff]'s brief improvement after
> surgery.   To suggest that the medical record
> indicates minimal pain and no significant
> clinical or objective abnormalities either
> before or after surgery to substantiate the
> opinions from the treating board-certified
> specialist borders on bad faith.

(Id. at 2-3 (citing Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination . . . .")) (emphasis added)); see also Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (instructing that, in deciding a disability claim, an ALJ is to "weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole").   Given the ALJ Decision, it is manifestly unclear whether the ALJ properly considered and, therefore, weighed, all of the evidence available, as he was required to do, versus a small component thereof.   Accordingly, remand is warranted.

      C.   Select Credibility Determinations by the ALJ

      It is well-settled "where [a court is] unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ, [the court] will not hesitate to remand for further findings or a clearer explanation for the decision." Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (quotations omitted)).   Such is the case here;[16] the Court is perplexed by the ALJ's credibility determinations.   It highlights two examples.

---

[16]   The Court provides two example of issues it has with the ALJ's credibility determinations; there are others.   For example, without adequate rationale, the ALJ concluded Plaintiff was lying when he testified that he began to work for the livery company in

1. <u>Based Upon Plaintiff's Oxygen Use</u>

As a purported example of Plaintiff's incredibility, the ALJ proffers Plaintiff's testimony regarding his oxygen use.  (<u>See</u> ALJ Decision, R. 21.)  Yet, once more, the ALJ fails to provide a fulsome picture; instead, he focuses upon Plaintiff's earlier oxygen use, failing to adequately discuss how said use expanded with time.  Indeed, the evidence shows Plaintiff's oxygen use was, essentially, full-time as of his mid-January 2019 incarceration. (<u>See, e.g.</u>, R. 1545-46.)  And, given Plaintiff's consistent testimony that he often forgets things (<u>see, e.g.</u>, R. at 87), it is not surprising he was unable to recall precisely when, in 2019, that prescription occurred; indeed, Plaintiff clearly testified he could not recall exactly when he was prescribed full-time oxygen. (R. 80.)  Moreover, the record evidence shows that, while incarcerated in 2019, Plaintiff was on oxygen (<u>see, e.g.</u>, R. 1525-26; R. 1545-46) and was taken to medical facilities outside the prison multiple times (<u>see, e.g.</u>, R. 1529-30, 1532, 1534, 1536,

_____

January 2019.  (<u>See</u> ALJ Decision, R. 21.)  A clearer explanation is warranted, especially since review of Plaintiff's testimony on the issue of his employment period with the livery company could, fairly viewed, show confusion on the part of Plaintiff.  (<u>See</u> R. 77-79.)  Indeed, there is ample record evidence that Plaintiff was easily confused or had difficulty remembering things.  (<u>See, e.g.</u>, <u>id.</u>; R. 87.)  The Court further notes there is a reference in the record to Plaintiff having a hearing aid.  (<u>See</u> R. 1584.) Therefore, it is possible Plaintiff did not accurately hear or understand the ALJ's inquiry; however, there is no indication the ALJ ever asked Plaintiff if he had problems hearing or with understanding his line of questioning.

1540-41, 1543, 1546, 1558, 1560, 1564-65, 1570, 1575, 1578); thus, it was entirely possible an outside doctor could have prescribed such oxygen use for Plaintiff while he was incarcerated. Given the evidence before him, at a minimum, the ALJ should have done more to develop the record if there appeared to be an apparent inconsistency. However, it appears the ALJ was content to jump to negative conclusions. At bottom, given the record before it, the Court is confounded by the ALJ's credibility conclusion based upon Plaintiff's documented escalating oxygen use, which conclusion the ALJ seems to have based upon Plaintiff's earlier oxygen use.

2. <u>Based Upon Plaintiff's Cane Use</u>

In his decision, the ALJ stated, <u>inter alia</u>:

> [Plaintiff] testified that Dr. Richard Michalowicz prescribed the cane in Jan[uary] 2018 and he has used it since. However, [Plaintiff] was in jail beginning in January 2019 after committing robbery and underwent several medical visits while incarcerated which does not record the use of a cane (Ex. B27F). More importantly, the medical evidence does not support the use of a cane which showed no atrophy, good strength and no sign of instability (e.g., Ex. B12F/3, 6, 19; B13F/68, etc.)
>
> Contrary to [Plaintiff's] testimony, Dr. Yuehuei noted [Plaintiff] was ambulating with a cane on June 26, 2017 (Ex. B17F/7). In addition, Dr. Keith Reinhardt noted on October 19, 2017 that [Plaintiff] was ambulating with a cane (Ex. B13F/15). These records indicate [Plaintiff] was already using a cane even before the date he said it was allegedly prescribed by Dr. Michalowicz.
>
> Foremost, Suzanne Kontak, ANP-C from South Shore Neurologic Associates noted on

60

> December 21, 2016 that [Plaintiff] "bought a
> cane in a thrift shop . . ." (Ex. B11F/8).
> [Plaintiff] is completely untrustworthy.

(ALJ Decision, R. 21-22.)    The Court finds the ALJ's
"untrustworthy" assessment curious and not necessarily logical.
It addresses each of the ALJ's contentions, in turn.

First, other than his initial question to Plaintiff,
i.e., whether Plaintiff was using a cane while a livery driver
(see Disability Hr'g Tr., R. 80), the ALJ did not meaningfully
engage in any follow-up inquiries, which could have assisted in
developing the record, especially if the ALJ had questions
regarding Plaintiff's cane use.    See, e.g., Jackson v. Kijakazi,
588 F. Supp. 3d 558, 577 (S.D.N.Y. 2022) (stating an ALJ has a
"duty to question the claimant adequately about any subjective
complaints and the impact of the claimant's impairments on the
claimant's functional capacity" (emphasis added; citations
omitted)).    Second, as to the absence of any reference to cane use
in Plaintiff's prison-medical-records:    The ALJ fails to mention
what is referenced, i.e., at least at some point while
incarcerated, the Plaintiff was ambulating with a wheelchair. (See
R. 1581.)    The use of a wheelchair would obviate the need to use
a cane and could explain why there was no mention of such cane use
in Plaintiff's prison-medical-records.[17]    The wheelchair reference

_____

[17]  Moreover, Plaintiff was placed in the prison's medical housing
unit while incarcerated (see R. 1525); he also had several visits

provided relevant information which should have prompted additional, specific inquiries into Plaintiff's testimony regarding his post-2018 cane use, especially if said cane use was critical to the ALJ's assessment of Plaintiff's credibility. Yet, as already discussed, the ALJ did not meaningfully pursue questioning on this matter. Given the medical evidence, in conjunction with the ALJ's failure to robustly inquire about Plaintiff's cane use, the Court is dubious about the ALJ's assessment. <u>Third</u>, and relatedly, as to Plaintiff's cane use prior to the purported prescription for same by Dr. Michalowicz, the Court does not find Plaintiff's testimony about that prescription contradicts the medical evidence regarding Plaintiff's pre-2018 cane use. It should be of no moment that Plaintiff was using a cane before receiving a prescription to do so or that he previously purchased the cane of his own volition; importantly, there is no indication that to use a cane, one is required to have a prescription. Moreover, as early as December 2016, while acknowledging Plaintiff bought a cane to use, the ANP-C <u>also advised Plaintiff to continue using the cane</u>. (<u>See</u> R. 468, 471.) Additionally, record evidence shows medical personnel consistently

---

to outside medical facilities (<u>see</u>, <u>supra</u>, 59); perhaps, he was on bed rest. In the absence of any further record development, such useful information is not available. Additional inquiry could have helped explain the ALJ's assessment and assisted this Court's review of same.

recording Plaintiff's gait was antalgic, slow or unsteady, and that he ambulated with a cane; similarly, there is medical evidence showing Plaintiff also suffered from knee pain, which could further explain his use of a cane when ambulating. At a minimum, this evidence goes to "[a]ny measures plaintiff uses or has used to relieve pain or other symptom", one of seven considerations an ALJ is to weigh in assessing a claimant's subjective complaints, especially regarding pain. Poceous, 2024 WL 3029197, at *10 (quoting 20 C.F.R. § 416.929(c)(3)); see also id. ("The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight." (quoting SSR 96-7p, 1996 WL 374186, at *2; emphasis added)). In this instance, the contradictory evidence to which the ALJ cites serves more to highlight his cherry-picking of evidence rather than to underscore purported spurious contentions in Plaintiff's testimony. (See, e.g., ALJ Decision, R. 21 (citing, by way of example "Ex. B12F/3, 6, 19; B13F/68, etc." as evidence that "d[id] not support the use of a cane").) Indeed, the ALJ's apparent reliance on his "gotcha" questioning about the cane-prescribing doctor is troubling; the Court fails to understand how Plaintiff's response about the alleged 2018 prescription is contrary to the

evidence regarding his earlier use of the cane, which other medical providers recognized and which one such provider recommended he continue using. At bottom, the Court is unpersuaded the ALJ's line of inquiry formed a reliable basis for discrediting Plaintiff's veracity and, ultimately, determining he is not disabled. See, e.g., Fernandez v. Astrue, No. 11-CV-3896, 2013 WL 1291284, at *18 (E.D.N.Y. Mar. 28, 2013) ("If the ALJ rejects [a claimant's] testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." (quoting Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010)); see also generally Castano v. Astrue, 650 F. Supp. 2d 270, 280 (E.D.N.Y. 2009) ("More fundamentally, the procedure before the Social Security Administration is not supposed to be adversarial, but, rather, inquisitorial. It is not a game of 'gotcha.' The goal is not for the Commissioner to 'win' a finding of nondisability, but to fairly determine if a claimant is disabled." (citation omitted; emphasis added)). At bottom, the ALJ has failed to "explain his reasoning in a way that permits the court to 'glean' the basis for his credibility determination", thereby requiring a remand. See, e.g., Hamilton v. Saul, No. 20-CV-0457, 2021 WL 4407873, at *3 (E.D.N.Y. Sept. 27, 2021) (remanding matter where, inter alia, in weighing testimony, ALJ

failed to "explain his reasoning in a way that permits the court to 'glean' the basis for his credibility determination"); see also Long v. Berryhill, No. 18-CV-1146, 2019 WL 1433077, at *3 (E.D.N.Y. Mar. 29, 2019) ("[R]emand is appropriate where inadequacies in the ALJ's analysis frustrate meaningful review, such as when the ALJ makes credibility determinations and draws inferences from the record, yet fails to fully explain the basis for them[.]" (internal citations omitted)).

-*-*-*-

Because it has determined remand is required in this instance, "the Court need not and does not reach [the parties'] remaining argument[s] . . . ." Kelly, 2024 WL 5120051, at *13 (quoting Rowe v. Berryhill, No. 17-CV-0208, 2018 WL 4233702, at *5 (W.D.N.Y. Sept. 6, 2018); further citing Keli Ann D. v. Comm'r of Soc. Sec., No. 23-CV-0765, 2024 WL 3493274, at *7 (N.D.N.Y. July 22, 2024) (same; quoting Rowe); Poceous, 2024 WL 3029197, at *15 n.13 (declining to consider plaintiff's further arguments in support of remand upon finding procedural error by ALJ warranting remand)).

III. Reassignment to Another ALJ

> Whether a case should be remanded to a different ALJ generally is a decision for the Commissioner to make. Sutherland v. Barnhart, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004). However, courts have ordered the Commissioner to reassign a case to a new ALJ on remand where the ALJ's conduct "g[a]ve[ ] rise to serious

65

concerns about the fundamental fairness of the disability review process[.]" (<u>Id.</u>)    In determining whether remand to a new ALJ is warranted, courts in this Circuit consider whether there is: "(1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; [or] (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party." (<u>Id.</u>)

<u>Roberto v. Saul</u>, No. 20-CV-1923, 2021 WL 3912298, at *8 (E.D.N.Y. Sept. 1, 2021).

In this instance, the Court is left with a strong impression that the ALJ was biased against Plaintiff given the ALJ's persistent and questionable focus upon Plaintiff's penal history, the relevance of which, in determining whether Plaintiff is disabled, the Court is hard-pressed to understand. Therefore, the Commissioner is strongly urged to reassign this case to a different ALJ upon remand.

[Remainder of page intentionally left blank.]

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED:**    (1) Plaintiff's Motion (ECF No. 15) is GRANTED; and (2) the Commissioner's Cross-Motion (ECF No. 20) is DENIED; this matter being REMANDED to the Commissioner for a new hearing and decision; and

**IT IS FURTHER ORDERED,** once Judgment has entered, the Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: July 31, 2025
        Central Islip, New York

67